22-2606 KMM/JFD

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
FOURTH DIVISION



RECEIVED

OCT 1 8 2022

CLERK, U.S. DISTRICT COURT
MINNEAPOLIS, MINNESOTA

---

UNITED STATES of AMERICA, and
STATE of MINNESOTA,
<u>ex rel.</u> MORGAN KLUENDER,

       Plaintiff–Relator,

v.

NUWAY ALLIANCE; NUWAY HOUSE,
INC.; NUWAY RECOVERY
FOUNDATION; NUWAY 1246, LLC;
NUWAY 1404, LLC; COCHRAN
RECOVERY SERVICES, INC.; THE
GABLES; DAVID VENNES; THOMAS
MEIER; JOHN MARSTON; KENNETH
ROBERTS; ANGELA HANSEN; and
LINDSAY BATTUELLO,

       Defendants

---

Civil Action No.:

**Filed under seal pursuant to
31 U.S.C. § 3730(b)(2)**

**<u>COMPLAINT</u>**



SCANNED

OCT 1 8 2022

U.S. DISTRICT COURT MPLS

## THE RELATOR DEMANDS A TRIAL BY JURY ON ALL COUNTS

## INTRODUCTION

1.      It is difficult to get paid for four hours' work in two hours. Yet this is precisely what Defendants (together, "NUWAY") conspired to do, operating together as a single unit, for more than thirty months from March 2020 through the present. NUWAY orchestrated a plan to break up two- or three-hour addiction counseling sessions into consecutive thirty-one minute units, resulting in hundreds of thousands of false claims to the government through Minnesota Medicaid programs. In hundreds of thousands of examples, NUWAY billed for four hours' services to particular clients, despite providing those services in a span of just two hours and nineteen minutes.

2.      NUWAY has violated the federal and Minnesota False Claims Acts in additional ways, by paying kickbacks to clients in the form of housing stipends on the condition that they remain clients, by submitting claims for providers who were not credentialed as required by contract, and by failing to return overpayments to government payors. Through these schemes, NUWAY knowingly violated the federal and Minnesota False Claims Acts, fueling an era of incredible profits and expansion.

### PARTIES

3.      Relator Morgan Kluender ("Relator") was employed by Defendant NUWAY House, Inc. as its Director of Revenue Cycle, overseeing Defendants' staff of up to fifteen medical billers until she was terminated for refusing to submit false claims to government payors. The Relator is a resident of Goodhue County, Minnesota.

4.      Defendant NUWAY House, Inc. ("House") is a Minnesota nonprofit corporation created in May 1966 (as "The Nu Way House, Inc."), headquartered at 2217 Nicollet Avenue South, Minneapolis, MN, 55404.

5.      Defendant NUWAY Alliance ("Alliance") is a Minnesota nonprofit corporation created in August 2019, headquartered at 2217 Nicollet Avenue South, Minneapolis, MN, 55404. Alliance was responsible for submitting claims to government payors for services provided at thirty addiction treatment centers owned or controlled by NUWAY. According to tax documents, Alliance was directly controlled by House, and the primary activity of Alliance was "to support the purposes of NUWAY House, Inc.").

6.      Defendant NUWAY Recovery Foundation ("Foundation") is a Minnesota nonprofit corporation created in August 2019, headquartered at 2217 Nicollet Avenue South, Minneapolis, MN, 55404. According to tax documents, Foundation was directly controlled by House, and the primary activity of Foundation was "to support the purposes of NUWAY House, Inc.").

7.      Defendant Cochran Recovery Services, Inc. ("Cochran") is a Minnesota nonprofit corporation created in May 1973, headquartered at 1294 18th Street East, Hastings, MN, 55033. According to business records, Defendant Kenneth Roberts is the President of Cochran, and Defendants Vennes and Marston serve as Directors.

8.      Defendant The Gables, LLC ("Gables") is a Minnesota limited liability company created in March 2020, headquartered at 2217 Nicollet Avenue South, Minneapolis, MN, 55404. According to business records, Defendant Thomas Meier is

3

the Manager of Gables. Although it is not a nonprofit corporation, Gables is part of Alliance, just like House, Foundation, and Cochran.

9.     Defendant NuWay 1246, LLC ("NuWay 1246") is a Minnesota limited liability company created in October 2018, headquartered at 2217 Nicollet Avenue South, Minneapolis, MN, 55404. According to business records, Defendant John Marston is the Manager of NuWay 1246. The purpose of NuWay 1246 was to own real estate used for NUWAY program services.

10.    Defendant NuWay 1404, LLC ("NuWay 1404") is a Minnesota limited liability company created in November 2017, headquartered at 2217 Nicollet Avenue South, Minneapolis, MN, 55404. According to business records, Defendant David Vennes is the Manager of NuWay 1404. The purpose of NuWay 1404 was to own real estate used for NUWAY program services.

11.    Defendant David Vennes is Chief Executive Officer and Chief Operating Officer for Alliance, as well as House, Foundation, and Cochran. Vennes resides in Minnesota.

12.    Defendant Thomas Meier is Chief Administrative Officer for Alliance, as well as House, Foundation, and Cochran. Meier resides in Minnesota.

13.    Defendant John Marston is Chief Financial Officer for Alliance, as well as House, Foundation, and Cochran. Marston resides in Minnesota.

14.    Defendant Kenneth Roberts is Chief Clinical Officer for Alliance, as well as House, Foundation, and Cochran. Roberts resides in Minnesota.

4

15.     Defendant Angela Hansen is the Quality, Training and Compliance Director for Alliance and House.  Hansen resides in Minnesota.

16.     Defendant Lindsay Battuello is Vice President of Outpatient Services at Alliance.  Battuello resides in Minnesota.

## JURISDICTION AND VENUE

17.     Pursuant to 28 U.S.C. § 1331, this District Court has original jurisdiction over the subject matter of this civil action since it arises under the laws of the United States, in particular the False Claims Act, 31 U.S.C. §§ 3729, *et seq.* ("FCA").  In addition, the FCA specifically confers jurisdiction upon the United States District Court. 31 U.S.C. § 3732(b).

18.     Pursuant to 28 U.S.C. § 1367, this District Court has supplemental jurisdiction over the subject matter of the claims brought pursuant to the Minnesota False Claims Act on the grounds that the claims are so related to the claims within this Court's original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

19.     This District Court has personal jurisdiction over Defendants pursuant to 31 U.S.C. § 3732(a) because the FCA authorizes nationwide service of process and Defendants have sufficient minimum contacts with the United States of America.

20.     Venue is proper in this district pursuant to 31 U.S.C. § 3732(a) because each of the Defendants transacts business in this judicial district.

5

## THE FALSE CLAIMS ACT AND MINNESOTA FALSE CLAIMS ACT

21.     The FCA provides for liability to the United States for, among other acts, knowingly causing the submission of false or fraudulent claims for payment to the United States, knowingly using a false record or making a false statement material to a claim, and conspiring to submit false claims, use false records, or make false statements. 31 U.S.C. § 3729(a)(1)(A)-(C).

22.     The FCA also provides for liability to the United States for knowingly concealing or knowingly and improperly avoiding or decreasing an obligation to pay or transmit money or property to the United States. 31 U.S.C. § 3729(a)(1)(G). Pursuant to the Affordable Care Act, overpayments from Medicare or Medicaid must be reported and returned within 60 days of being identified. 42 U.S.C. § 1320a-7k(d)(1), (2), (4)(B). Failure to return Medicare or Medicaid payments within the 60-day period is a violation of the FCA. 42 U.S.C. § 1320a-7k(d)(3). For purposes of the 60-day period, an overpayment is deemed "identified" if a person "has, or should have through the exercise of reasonable diligence, determined that the person has received an overpayment and quantified the amount of the overpayment." 42 C.F.R. 401.305(2).

23.     The FCA, 31 U.S.C. § 3729(a)(1), provides that subject to damage limitations specified at 31 U.S.C. § 3729(a)(2), any person who violates the FCA is liable to the United States for treble damages, and for civil penalties of not less than $5,000 and not more than $10,000. Pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, as amended by the Debt Collection Improvement Act of 1996, 28 U.S.C. § 2461 (notes), and 64 Fed. Reg. 47099, 47103 (1999), the FCA civil penalties were adjusted

to a range of $5,500, to $11,000 for each violation occurring on or after September 29, 1999.

24.     On November 2, 2015, the Federal Civil Monetary Penalties Inflation Adjustment Act of 1990 was further amended by the Bipartisan Budget Act of 2015, as codified at 28 U.S.C. § 2461, substituting a different statutory formula for calculating inflation adjustments on an annual basis. With respect to all violations of the FCA occurring after November 2, 2015, penalties are now assessed according to inflation adjustments published by the Department of Justice. FCA penalties assessed after May 9, 2022, whose associated violations occurred after November 2, 2015, have been adjusted to a minimum of $12,537 and a maximum of $25,076. 28 C.F.R. Part 85.

25.     The Minnesota False Claims Act ("MN FCA") is patterned after the FCA. Like the FCA, it provides for liability to the State of Minnesota for knowingly presenting false claims or causing them to be presented, knowingly making or using false records or statements material to a false or fraudulent claim, or knowingly conspiring to commit a violation of the MN FCA. M.S.A. §15C.02(a)(1)-(3). Like the FCA, the MN FCA provides for liability for knowingly concealing or knowingly and improperly avoiding or decreasing an obligation to pay or transmit money or property to the state or a political subdivision. M.S.A. §15C.02(a)(7). Violations of the MN FCA incur civil penalties in the amounts set forth in the FCA, as adjusted by the federal Civil Penalties Inflation Adjustment Act Improvements Act of 2015. M.S.A. §15C.02(a).

7

## GOVERNMENT HEALTH CARE PAYORS IN MINNESOTA

26.     The Health Insurance for the Aged and Disabled Act (Title XVIII of the Social Security Act) known as "Medicare," is a health insurance program designed to assist the nation's elderly meet healthcare costs.  In addition, Medicare also provides medical coverage for many individuals who are permanently disabled under the Social Security Act. Medicare includes hospital insurance, Part A, and supplementary medical insurance ("SMI"), Part B.  Medicare Part B is a voluntary medical insurance plan designed to supplement hospital insurance coverage. Part B is financed by premiums paid monthly by enrollees and by the federal government.

27.     Medicare pays only for services or equipment that are reasonable and medically necessary.  42 U.S.C. § 1395y(a)(1)(A).

28.     Every provider who enters into a contract with Medicare agrees to comply with Medicare's laws, regulations and program instructions.  Each provider specifically acknowledges in its provider contract that the provider understands "that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations and program instructions (including, but not limited to, the Federal anti-kickback statute and the Stark law), and on the [provider]'s compliance with all applicable conditions of participation in Medicare."

29.     Medicaid is a joint program between the states and the federal government to provide health care benefits to the poor and disabled.  Medicaid programs are jointly funded by state and federal governments, but each program must meet minimum requirements, established by federal law, in order to obtain federal

funding. In order to be eligible for federal assistance under the Medicaid program, a state must have a plan for medical assistance that has been approved by the Secretary of Health and Human Services ("HHS"). 42 U.S.C. § 1396a(a).

30.     When the Secretary of HHS approves a state's plan, the state then administers the various medical assistance programs under the Medicaid umbrella and the federal government provides grants to the state to reimburse them for medical services provided.

31.     Federal Medicaid laws and policies encourage the states to also provide health care services to Medicaid beneficiaries through managed care plans, which are known as Managed Care Organizations (MCOs). Each of the states' Medicaid programs contract with one or more MCOs that operate within their states to pay a capitated rate, per member, per month, for each Medicaid eligible patient who agrees to receive their Medicaid benefits through the MCO. The MCOs are certified under federal law, and the provisions of contracts between the state Medicaid programs and the MCOs, including the data on utilization that must be provided to the state Medicaid programs and the types of claims that the MCOs may submit for services, must comply with federal requirements.

32.     The Minnesota Medicaid programs, "Medical Assistance" and "MinnesotaCare" (together, "MnCare"), provide medical services that are medically necessary for eligible beneficiaries unless limitations are noted with the policy restrictions of the relevant Provider Manuals. MnCare has contracted with Managed Care Organizations ("MCOs") to provide services to Medicaid beneficiaries,

9

administered by the State or through political subdivisions, which sponsor Prepaid Medical Assistance Programs ("PMAPs"). Together, Medical Assistance and MCOs comprise Medicaid's Minnesota Health Care Programs ("MHCP").

33.     When providing for and billing for services providers must follow Medical Assistance and MCO billing policies, the Medical Assistance Provider Manual, and the MCO provider manuals.

34.     MnCare restricts reimbursement of services to those that are reasonable and necessary for the diagnosis or treatment of illness or injury. All providers that submit claims to MHCP must do so "when, and to the extent medically necessary." 42 U.S.C. § 1320c-5(a).

## THE NUWAY DEFENDANTS

35.     NUWAY operates several outpatient and residential treatment centers throughout Minnesota, specializing in treating clients recovering from co-occurring substance use and mental health disorders. The vast majority of clients to whom NUWAY provides services, in excess of 90%, have care paid for through PMAP or other Medicaid programs. Services for the remaining clients are paid for through commercial insurance, charity programs, or by the clients themselves.

36.     Alliance controls House, Cochran, and Foundation, and Alliance corporate officers, including Vennes (CEO), Marston (CFO), Meier (CAO), and Roberts (CCO). Alliance also employed and compensated other NUWAY employees, including those at the Director level who operated House. Alliance corporate officers, including

10

Vennes, Marston, Meier, and Roberts, have served as members of the House Board of Directors.

37.     House operates three residential facilities, frequently referred to as "NUWAY I," "NUWAY II," and "NUWAY III," located within a few blocks of each other in Minneapolis, at 2200 First Avenue South (NUWAY I), 2518 First Avenue South (NUWAY II), and 2104 Stevens Avenue South (NUWAY III) (together, the "Residential Facilities"). House also operates a residential facility in Hastings, MN through a management contract with Cochran. In addition to the Residential Facilities and the Cochran facility, House provides some services, including payor billing services, for Gables, which operates a residential facility for women in Rochester, MN.

38.     House also operates eight outpatient facilities, in Minneapolis, St. Paul, Rochester, Duluth, St. Cloud, and Mankato, Minnesota (the "Outpatient Facilities"). NuWay 1404, LLC owns the property at 1404 Central Ave Northeast, Minneapolis, at which one of the outpatient facilities is operated; NuWay 1246, LLC owns the property at 1246 University Avenue West, St. Paul, where House operates one of the other facilities.

39.     The Outpatient Facilities represent an era of rapid expansion for NUWAY. In early 2019, only three of the eight Outpatient Facilities were open: those at 1404 Central Ave Northeast in Minneapolis (the "3Rs Facility"), 2118 Blaisdell Avenue South in Minneapolis (the "2118 Facility"), and 545 7th Street St. West in St. Paul (the "St. Paul Facility"), which had been opened in 2017. In June 2019, however, NUWAY opened a second facility in St. Paul, at 1246 University Avenue West (the "University Facility"),

11

followed later in 2019 by openings at 300 11th Avenue NW in Rochester (the "Rochester Facility") and 4615 Grand Ave W in Duluth (the "Duluth Facility"). NUWAY opened its seventh outpatient facility in April 2021 at 1420 West Saint Germain St. in St. Cloud (the "St. Cloud Facility"), followed closely in June 2021 by the opening of an eighth facility at 802 S. Front St. in Mankato (the "Mankato Facility").

40.     Through Foundation, NUWAY subsidizes independent housing for clients who receive services at the Outpatient Facilities. Through Foundation and House, NUWAY provides clients of the Outpatient Facilities a variety of other services, including food, transportation assistance, and drug testing.

41.     Counseling services were provided at the Residential Facilities and the Outpatient Facilities by several types of clinicians. Interns, referred to at NUWAY as "ADCs," were NUWAY's lowest-level clinicians, primarily college students completing practicums. House also employed licensed alcohol and drug counselors ("LADCs"), licensed professional counselors ("LPCs"), licensed professional clinical counselors ("LPCCs"), and a more limited number of licensed marriage and family therapists ("LMFTs"). All of these clinicians were employed by House (together, "House Clinicians").

42.     NUWAY, through Chief Clinical Officer Ken Roberts, VP of Outpatient Services Lindsay Battuello, and other staff, directed House Clinicians to keep their own attendance at group counseling and record the beginning and ending times of the services they provided.

12

43.    Throughout 2020 and through the present, Vennes, Marston, Meier, Roberts, Battuello and all clinicians have had their bonuses determined, in large part, on the ratio of service units provided for every NUWAY client. This created an incentive for clinicians to record services in minimum billable units, including by breaking up group counseling sessions in to 31-minute units.

### BILLING HOURLY SERVICES IN SERIAL INCREMENTS OF 31 MINUTES

44.    At NUWAY's Outpatient Facilities, most services are provided to clients in a group counseling setting. The Minnesota Provider Manual provides that the H2035 billing code, typically used for individual services, may be used for group services with a modifier of "HQ." Through the Manual, Minnesota Department of Health Services ("MN DHS") defines the H2035 code as "alcohol and/or drug counseling per hour." Through the Manual, MN DHS established that the code is "defined by a unit of time," which "is attained when the mid-point is passed, and more than half of the time must be spent performing the service for reporting a specific code, excluding any breaks" (hereafter, referred to as the "31 Minute Rule").

45.    Even before March 2020, NUWAY had a history of abusing MN DHS's definition of "alcohol and/or drug counseling per hour," frequently recording and billing for counseling sessions that were 31, 35, or 40 minutes. In March 2020, however, faced with a sudden shortfall in expected revenue due to the COVID-19 pandemic and uncertainty about telehealth counseling sessions, NUWAY orchestrated a scheme to take its frequent abuse of the 31 Minute Rule into a standard practice, knowingly breaking up group counseling sessions of between two and three hours into four or five

13

"alcohol and/or drug counseling per hour" units, thereby intentionally billing for four or five hours of services when only two or three hours of services had been provided.

46.     On or about March 20th, 2020, NUWAY, through Roberts and Battuello, instructed staff at its then-open six outpatient facilities (the 3Rs Facility, 2118 Facility, St. Paul Facility, University Facility, Rochester Facility, and Duluth Facility) to record group counseling sessions in a new way, by breaking up those sessions into 31 minute units, with the goal of billing four or five units per client that a House Clinician was expecting to treat on any particular day.

47.     Overnight, the session recording practices at each of the facilities changed dramatically, starting on March 20, 2020, a Friday, or the following Monday, March 23, 2020. Between March 1 and March 19 that month, the six outpatient facilities combined to record just 424 counseling sessions that were exactly 31 minutes long. Between March 20 and March 31, however, that number ballooned to **19,352 recorded sessions of exactly 31 minutes' duration**, accounting for a majority of the units recorded by House Clinicians.

48.     Eventually, the session recording practices by House Clinicians at all of the Outpatient Facilities was homogenized. In the first days of the new practice ordered by NUWAY through Roberts and Battuello, however, the six outpatient facilities interpreted that instruction in different ways, evidencing that it was given to all facilities, but with minimal explanation, initially, on how to enact the new policy.

49.     At the Rochester facility, three House Clinicians (E.B., C.M., and A.M.) recorded H2035 HQ group counseling services consecutively with no breaks

14

whatsoever on March 20, 2020. Each recorded group counseling sessions with

consecutive start times, beginning at 8:30, including these group sessions recorded by

House Clinician A.M.:

| SESSION | START | END | DURATION | CLIENTS IN GROUP SESSION |
|---|---|---|---|---|
| 1 | 8:30 | 9:01 | 31 minutes | T.A., D.C., M.C., K.H., A.M., K.O., R.P., A.R., K.T., J.V. |
| 2 | 9:02 | 9:33 | 31 minutes | T.A., D.C., M.C., K.H., K.O., R.P., A.R., K.T., J.V. (same as Session 1, except for client A.M.) |
| 3 | 9:34 | 10:05 | 31 minutes | T.A., D.C., M.C., K.H., K.O., R.P., A.R., K.T., J.V. (same as Session 2) |
| 4 | 10:06 | 10:37 | 31 minutes | T.A., D.C., M.C., K.H., K.O., R.P., A.R., K.T., J.V. (same as Sessions 2 and 3) |
| TOTAL TIME SPAN | 8:30 | 10:37 | 2 hours, 7 minutes | |

For the nine clients present in all four group counseling sessions, House submitted

claims for four H2035 HQ units to PMAPs (for T.A., M.C., K.O., R.P. and K.T., to the

UCare PMAP; for D.C., A.R. and J.V., to the Blue Plus PMAP; for K.H., to the Health

Partners PMAP). In so doing, NUWAY submitted or caused to be submitted false

claims in violation of the FCA and MN FCA.

50.     At the 2118 Facility, 16 House Clinicians interpreted the directions of

NUWAY more conservatively; it appears they were instructed by someone at the

facility to bill 31 minute sessions with breaks of 15 minutes in between. Ten of the

House Clinicians did so with breaks technically 14 minutes long (D.A., D.B., E.C., B.D.,

H.H., J.H., M.H., A.H., S.M., and K.O.), including the group sessions recorded by E.C.:

| SESSION | START | END | DURATION | CLIENTS IN GROUP SESSION |
|---|---|---|---|---|
| 1 | 12:30 | 1:01 | 31 minutes | K.A., B.B., E.C., S.C., E.H., C.J., J.M., A.S., N.W. |

| | | | | |
|---|---|---|---|---|
| *Break of 14 minutes* | | | | |
| 2 | 1:16 | 1:47 | 31 minutes | K.A., B.B., E.C., S.C., E.H., C.J., J.M., A.S., N.W. (same as Session 1) |
| *Break of 14 minutes* | | | | |
| 3 | 2:02 | 2:33 | 31 minutes | K.A., B.B., E.C., S.C., E.H., C.J., J.M., A.S., N.W. (same as Sessions 1 and 2) |
| *Break of 14 minutes* | | | | |
| 4 | 2:48 | 3:19 | 31 minutes | K.A., B.B., E.C., S.C., E.H., C.J., J.M., A.S., N.W. (same as Sessions 1, 2 and 3) |
| TOTAL TIME SPAN | 12:30 | 3:19 | 2 hours, 49 minutes | |

NUWAY caused claims to be submitted for eight of the nine clients counseled by E.C. in

the four group sessions to PMAP or Medical Assistance programs (for K.A. and S.C.,

Medical Assistance; for B.B., Health Partners PMAP; for E.C. and J.M., UCare PMAP;

for C.J., Hennepin Health PMAP; for A.S. and N.W., Blue Plus PMAP). The remaining 6

House Clinicians at the 2118 Facility staggered the *start* times of their recorded sessions

by 15 minutes, leaving breaks of exactly 13 minutes in between (C.B., K.B., C.L., K.L.,

K.M., and W.W.), with group sessions billed like those of K.B.:

| SESSION | START | END | DURATION | CLIENTS IN GROUP SESSION |
|---|---|---|---|---|
| 1 | 8:30 | 9:01 | 31 minutes | A.B., T.B., N.B., N.F., N.L., R.L., D.L., A.M., C.S., N.T., G.Y. |
| *Break of 13 minutes* | | | | |
| 2 | 9:15 | 9:46 | 31 minutes | A.B., T.B., N.B., N.F., N.L., R.L., D.L., A.M., C.S., N.T., G.Y. (same as Session 1) |
| *Break of 13 minutes* | | | | |
| 3 | 10:00 | 10:31 | 31 minutes | A.B., T.B., N.B., N.F., N.L., R.L., D.L., A.M., C.S., N.T., G.Y. (same as Sessions 1 and 2) |
| *Break of 13 minutes* | | | | |
| 4 | 10:45 | 11:16 | 31 minutes | A.B., T.B., N.B., N.F., N.L., R.L., D.L., A.M., C.S., N.T., G.Y. (same as Sessions 1, 2 and 3) |
| TOTAL TIME | 8:30 | 11:16 | 2 hours, 46 minutes | |

| SPAN | | | | |
|------|--|--|--|--|

All eleven of the clients to whom K.B. provided group counseling services had their less than three hours' worth of counseling billed to PMAPs or Medical Assistance as false claims of four hourly units (A.B., R.L., N.T. and G.Y., Hennepin Health PMAP; T.B., N.F. and C.S, Blue Plus PMAP; N.B. and A.M., UCare PMAP; N.L. and D.L., Medical Assistance).

51.     At the 3Rs Facility, the orders from NUWAY to record group counseling sessions as separate sessions of 31 minutes was interpreted in a radically different way, as consecutive *individual* sessions.  All three House Clinicians who recorded sessions in this way managed to record consecutive sessions with little to no breaks.  House Clinician B.M. recorded twelve different sessions of 31 minutes' duration.  House Clinician L.P. recorded nine different sessions of 31 minutes' duration without a single minute of break, starting at 8:30 and finishing at 1:17, with House then submitting claims for nine hours' worth of counseling services that were provided in less than five hours.  While the session times recorded by B.M. and L.P. were extremely implausible, House Clinician E.Z. managed the impossible with three overlapping 31-minute sessions among 12 recorded:

| SESSION | START | END | DURATION | CLIENTS IN GROUP SESSION |
|---------|-------|-----|----------|--------------------------|
| 1 | 9:00 | 9:31 | 31 minutes | J.J. (UCare PMAP) |
| 2 | 9:32 | 10:03 | 31 minutes | B.P. (UCare PMAP) |
| 3 | 10:04 | 10:35 | 31 minutes | C.T. (UBH/Medica PMAP) |
| 4 | 10:36 | 11:07 | 31 minutes | N.Y. (Blue Plus PMAP) |
| *Break of 22 minutes* | | | | |
| 5 | 11:30 | 12:01 | 31 minutes | D.M. (UBH/Medica PMAP) |
| 6 | 12:02 | 12:33 | 31 minutes | C.E. (Health Partners PMAP) |
| 7 | 12:34 | 1:05 | 31 minutes | R.B. (Hennepin Health PMAP) |

| | | | Break of 1 minute | |
|---|---|---|---|---|
| 8 | 1:07 | 1:38 | 31 minutes | J.A. (BluePlus PMAP) |
| | | | Break of 1 minute | |
| 9 | 1:40 | 2:11 | 31 minutes | K.E. (UCare PMAP) |
| 10 | 2:12 | **2:43** | 31 minutes | S.C. (UBH/Medica – Commercial) |
| 11 | **2:43** | **3:14** | 31 minutes | J.K. (Blue Plus PMAP) |
| 12 | **3:12** | 3:43 | 31 minutes | K.E. (Blue Plus PMAP) |

For the counseling services provided by E.Z. at the 3Rs Facility on March 20, 2020,

NUWAY submitted or caused to be submitted false claims to government payors: 12

different units of hour-long counseling provided in a span of less than 7 hours,

including two different 31-minute "hour" sessions provided in a span of 61 minutes.

52.     At the Duluth Facility, which as of March 20, 2020 had been open for less

than four months, two House Clinicians (Z.T., S.S.) interpreted NUWAY's instruction in

a way more consistent with the practice NUWAY soon adopted system-wide, with

consecutive 31-minute sessions starting five minutes after a previous session's end

(technically, breaks of four minutes).  For House Clinician S.S., that meant recording

four different group sessions with the same set of six clients:

| SESSION | START | END | DURATION | CLIENTS IN GROUP SESSION |
|---|---|---|---|---|
| 1 | 9:00 | 9:31 | 31 minutes | R.B., E.F., J.M., J.O., B.S., J.W. |
| | | | Break of 4 minutes | |
| 2 | 9:36 | 10:07 | 31 minutes | R.B., E.F., J.M., J.O., B.S., J.W. (same as Session 1) |
| | | | Break of 4 minutes | |
| 3 | 10:12 | 10:43 | 31 minutes | R.B., E.F., J.M., J.O., B.S., J.W. (same as Sessions 1 and 2) |
| | | | Break of 4 minutes | |
| 4 | 10:48 | 11:19 | 31 minutes | R.B., E.F., J.M., J.O., B.S., J.W. (same as Sessions 1, 2 and 3) |
| TOTAL TIME SPAN | 9:00 | 11:19 | 2 hours, 19 minutes | |

If recorded as a single session of group counseling, the counseling provided by S.S. between 9:00 and 11:19 would have entitled House to bill for just two units of H2035 HQ for each of the six clients in the group. By breaking the session up into smaller recorded units, however, NUWAY, through House, submitted false claims of H2035 HQ for four hour-long units of counseling.

53.    After the weekend, on March 23, 2020, House Clinicians at the St. Paul Facility and the University Facility also began billing group sessions as consecutive 31-minute sessions interspersed by breaks of four minutes, as S.S. had done the Friday before at the Duluth Facility. As a direct result, House submitted false claims to government and other payors for counseling services provided on March 23, 2020 at each facility, including 362 units by 11 House Clinicians at the St. Paul Facility, and 542 units by 12 House Clinicians at the University Facility.

54.    By May of 2020, the practice of recording group sessions as separate, consecutive 31-minute group sessions with exactly four minutes of break in between was incredibly consistent at the six Outpatient Facilities then operated by NUWAY, with more than 70,000 units of H2035 billed to payors in that month alone. By March 2022, with the practice firmly entrenched at the St. Cloud Facility and Mankato Facility, the number of H2035 units recorded as 31-minute sessions was regularly 80,000 per month.

55.    By June of 2021, when the St. Cloud Facility began billing according to the same pattern of 31-minute group sessions separated by four-minute breaks, NUWAY was regularly abusing the 31-Minute Rule in additional ways. By June 2021, it had

become the norm at all facilities to bill for not four, but five consecutive 31-minute group sessions, such that NUWAY billed or caused the billing of five different "units" of hour-long counseling services within a span of less than three hours.

56.    A second way that NUWAY increasingly abused the 31-Minute Rule was by providing consecutive 31-minute group sessions to a single patient.  For instance, on June 14, 2021 client C.H. received seven units of ostensibly hour-long counseling sessions from a single provider at the St. Cloud Facility, House Clinician A.D., within a span of just over four hours:

| SESSION | START | END | DURATION | TYPE OF SESSION |
|---|---|---|---|---|
| 1 | 7:54 | 8:25 | 31 minutes | Group (sole client in session) |
| Break of 4 minutes | | | | |
| 2 | 8:30 | 9:01 | 31 minutes | Group (sole client in session) |
| Break of 4 minutes | | | | |
| 3 | 9:06 | 9:37 | 31 minutes | Group (sole client in session) |
| Break of 4 minutes | | | | |
| 4 | 9:42 | 10:13 | 31 minutes | Group (sole client in session) |
| Break of 4 minutes | | | | |
| 5 | 10:18 | 10:49 | 31 minutes | Group (sole client in session) |
| Break of 10 minutes | | | | |
| 6 | 11:00 | 11:31 | 31 minutes | Individual session |
| Break of 3 minutes | | | | |
| 7 | 11:35 | 12:06 | 31 minutes | Individual session |
| TOTAL TIME SPAN | 7:54 | 12:06 | 4 hours and 12 minutes | |

NUWAY submitted false claims for seven units of counseling to C.H. to the Medical Assistance program, claims also rendered false in that for the five units of group counseling, C.H. was the only client in the group.

57.    A third way that NUWAY increasingly abused the 31-Minute Rule was by having multiple House Clinicians provide group counseling services to a single client in

the same day. For instance, on June 1, 2021, House Clinicians J.G. and M.W. recorded providing a total of nine hour-long units of counseling services to client A.H. in a span of less than six hours.

58.   House Clinicians' adherence to the NUWAY policy of billing for 31-minute sessions had other absurd consequences. On June 3, 2021, for example, House Clinician L.M. recorded providing services between 7:25 and 1:11 at the 3Rs Facility, managing to record ten different "hour" sessions within those six hours:

| SESSION | START | END | DURATION | TYPE OF SESSION |
|---|---|---|---|---|
| 1 | 7:25 | 7:56 | 31 minutes | Individual, client A.T. |
| 2 | 7:57 | 8:28 | 31 minutes | Individual, client S.N. |
| Break of 1 minute | | | | |
| 3 | 8:30 | 9:01 | 31 minutes | Group, clients K.A., A.H., A.J., K.J., M.M., R.M., T.M., S.N., J.R., A.T., A.U., K.V., C.W., and B.W. |
| Break of 4 minutes | | | | |
| 4 | 9:06 | 9:37 | 31 minutes | Group, clients K.A., A.H., A.J., K.J., M.M., R.M., T.M., S.N., J.R., A.T., A.U., K.V., C.W., and B.W. |
| Break of 4 minutes | | | | |
| 5 | 9:42 | 10:13 | 31 minutes | Group, clients K.A., A.H., A.J., K.J., M.M., R.M., T.M., S.N., J.R., A.T., A.U., K.V., C.W., and B.W. |
| Break of 4 minutes | | | | |
| 6 | 10:18 | 10:49 | 31 minutes | Group, clients K.A., A.H., A.J., K.J., M.M., R.M., T.M., S.N., J.R., A.T., A.U., K.V., C.W., and B.W. |
| Break of 4 minutes | | | | |
| 7 | 10:54 | 11:25 | 31 minutes | Group, clients K.A., A.H., A.J., K.J., M.M., R.M., T.M., S.N., J.R., A.T., A.U., K.V., C.W., and B.W. |
| Break of 4 minutes | | | | |
| 8 | 11:30 | 12:01 | 31 minutes | Individual, client K.V. |
| Break of 3 minutes | | | | |
| 9 | 12:05 | 12:36 | 31 minutes | Individual, client C.W. |
| Break of 3 minutes | | | | |

| 10 | 12:40 | 1:11 | 31 minutes | Individual, client K.J. |
|---|---|---|---|---|
| TOTAL TIME SPAN | 7:25 | 1:11 | 5 hours and 46 minutes | |

Despite working during a span of less than six hours that day, pursuant to the way she

recorded her counseling sessions, House submitted claims to Medical Assistance and

several PMAPs for a total of five "hour" units of individual counseling, and a total of 70

units of group counseling (five "hour" units for each of 14 clients), for which House was

reimbursed approximately $4,178.51.

59.     As early as March 2020, NUWAY acted in full knowledge that by

recording group sessions as consecutive 31-minute sessions and billing for more units

than were actually provided, they were submitting, or causing to be submitted, false

claims to the government. In 2021 and 2022, however, NUWAY was notified again and

again that this practice constituted fraud, principally through audit findings.

60.     In March 2021, NUWAY was contacted by Alliant ASO ("Alliant"), which

had been contracted by Blue Cross Blue Shield to perform an audit of claims submitted

by House. As requested by Alliant, the Quality, Training and Compliance Department

at House selected records for 32 clients from October 1, 2019 through September 30,

2020, which were furnished to Alliant in April 2021. In April 2021, Blue Cross Blue

Shield opened a second audit of claims submitted by House.

61.     As part of her response responsibilities for the 2021 audits, the Relator

identified what appeared to be a concerted effort to record counseling sessions in 31

minute increments. On or about November 16, 2021, the Relator inquired about this

practice in a phone call with CFO John Marston, and inquired about why it had

occurred. The Relator noted to Marston that because NUWAY was frequently providing multiple units of services to clients on the same day, leveraging the midway point of a unit as a unit would create overlapped billing. Marston committed to discussing the issue with Ken Roberts, the Chief Clinical Officer.

62.     On November 23, 2021, the Relator received an email from Angela Hansen, House's Director of Quality, Training and Compliance. In the email, Hansen acknowledged that NUWAY was intentionally recording group sessions as "4 notes in 31 min increments," and noted that she was "looking at this as a risk area for the organization from the MN DHS lens." Hansen asked the Relator if the practice was "in line with billing procedures to support 20 hours of services weekly," and asked if group sessions would still be considered four units if they were recorded as two sessions of 91 minutes.

63.     It was the receipt of Hansen's email on November 23, 2021 that confirmed to the Relator that the large number of consecutive 31-minute group sessions was the result of a deliberate business practice initiated at the highest levels of NUWAY.

64.     On January 13, 2022, Blue Cross Blue Shield held a virtual meeting via Zoom with the Relator, Marston, Roberts, Hansen, and others in order to discuss their findings from the second audit, initiated the prior April. In that meeting, Blue Cross Blue Shield expressed that NUWAY did not maintain sufficient clinical documentation to substantiate House's billing, specifically asking if sessions had been standardized because of the lack of variance in start and stop times for sessions.

65.     On January 14, 2022, Alliant submitted its audit findings to the Relator, who forwarded them to Marston and others at NUWAY. Among the most significant findings were that among the 971 claims records reviewed by Alliant, there were 620 instances – nearly two-thirds of the claims – in which the number of units claimed by NUWAY exceeded the number of units documented. NUWAY's concerted effort to bill group sessions as consecutive 31-minute sessions had only started nearly halfway (March 20, 2020) through the period of time that Alliant was auditing (October 1, 2019 through September 30, 2020), making Alliant's findings very significant.

66.     Alliant directed NUWAY to Covered Services and Billing subsection of the Manual's Substance Use Disorder Services section with respect to each of the 620 instances it had identified of number of units claimed not being supported by services documented. With respect to the 620 instances, Alliant separately noted that a reason why House's billing was not sufficiently supported was: "Four (4) hours of group counseling were billed separately with individual start and end times documented on each note. In almost all instances, the start and end time supported exactly thirty-one (31) minutes of service." This included instances in which four units were billed despite a member leaving early, or being absent for all or part of a session.

67.     Since it began the practice of intentionally providing counseling services in 31-minute increments, NUWAY knew that because 31 minutes of counseling in an hour could only justify a unit of billing if there were no breaks among those 31 minutes, by purposefully limiting all counseling sessions to 31 minutes, a significant number of those sessions would not qualify for "hour" services designated by the H2035 code.

24

Alliant noted when reporting its audit findings in January 2022 that it had detected "multiple occasions" of a client "falling asleep, needing redirection to stay awake, and even needing to be woken up at the end of group" – but that "it appeared that the [client] was always given full credit for the group."

68.     On March 22, 2022, the Relator emailed Marston, Roberts, and Hansen about the 31-minute session audit findings.  Marston asserted that the audit results did not indicate that NUWAY's practices with respect to 31-minute sessions was inappropriate, and stated that there had not been any further discussions about changing the practice of providing services in 31-minute increments since auditors had only raised the issue once.

69.     Beginning in April 2022, NUWAY began working with the HMA Institute of Addiction ("HMA") to review NUWAY's revenue cycle practices.  On August 11, 2022, HMA presented its findings with a presentation and Zoom meeting, at which the Relator, Marston, Meier, Hansen, and Roberts were present for NUWAY.

70.     Among HMA's concerning findings was the fact that clinical personnel, specifically House Clinicians, were responsible for some tasks – such as the division of services into units – that should be within the responsibility of NUWAY's Revenue Cycle team.  Speaking for HMA, Dr. Corey Waller noted that HMA had specifically avoided including slides about NUWAY billing practices in their presentation because it would evidence knowledge about fraud, waste and abuse at NUWAY.  He noted that having every client have the exact same start and stop time for sessions, all of which

were exactly 31 minutes, was a big red flag, and that if this practice was not stopped within six months NUWAY's practices would be "beyond gross negligence."

71.     After HMA's presentation but also on August 11, 2022, the Relator contacted Marston to inform him that based on her initial assessment, approximately $58 million in claims had been paid for 31-minute sessions for which NUWAY was essentially billing for having clients be in two places at once. The Relator reported to Marston that she would not allow further claims to be submitted to payors that involved consecutive 31-minute sessions. Marston responded that he could not unilaterally decide to stop revenue, and said he would speak with CEO Vennes the next day. Marston also stated that although he could not remember for sure, he believed the practice of recording 31-minute sessions for groups was a result of telehealth services and client attention spans.

72.     The next day, on August 12, 2022, Marston told the Relator that he had spoken with Vennes about the 31-minute billing issue and other HMA findings. According to Marston, Vennes told Marston he was overreacting, and that once regulating agencies understood the good NUWAY was providing, they'd overlook any wrongdoing. Marston nonetheless accepted the Relator's proposal to identify all of the claims that had been recorded and paid for overlapping units of "hour" services, and approved the use of an outside vendor to create that report.

73.     The overlapping 31-minute sessions billed to government payors were identified by NUWAY no later than the date the resulting reports were completed. The

overpayments identified in those reports were not returned to the government within 60 days, in violation of 31 U.S.C. § 3729(a)(1)(G).

### SUBMISSION OF CLAIMS FOR UNCREDENTIALED CLINICIANS

74.     MHCP clinicians, including Licensed Alcohol and Drug Counselor ("LADCs"), Licensed Professional Counselor ("LPCs"), Licensed Professional Clinical Counselor ("LPCCs"), and Licensed Marriage and Family Therapist ("LMFT") must enroll in the Medical Assistance and MCO programs in order to be paid for covered services that they provide to Medicaid beneficiaries.

75.     In order to enroll as a MHCP provider, clinicians must complete a Medicaid enrollment and credentialing application.

76.     Medical Assistance and all MCOs have adopted the Minnesota Uniform Credentialing Application.  All providers must submit the Minnesota Uniform Credentialing Application through the Minnesota Provider Screening and Enrollment (MPSE) portal or via fax.

77.     MHCP mandates that all clinicians serving Medicaid beneficiaries complete the Minnesota Uniform Credentialing Application and become an approved credentialed provider before rendering services and presenting claims for reimbursement.

78.     This enrollment and credentialing process is designed to protect Medicaid beneficiaries from receiving care or services from unqualified providers, protect Medicaid beneficiaries from providers whose licenses are limited or restricted, and

27

protect Medicaid beneficiaries from providers who are excluded from the Medicaid program and other Federal Healthcare Programs.

79.     If the provider is not credentialed with Medical Assistance or MCO payer at the time of service, then the payer does not have to reimburse the facility, and the facility cannot bill the Medicaid beneficiary.

80.     In December 2016, NuWay terminated its credentialing coordinator, Mary-Jean Dunn. Ms. Dunn was responsible for coordinating and submitting all NuWay providers' credentialing applications. Ms. Dunn would submit all credentialing applications for NuWay providers via the MPSE portal. After terminating Ms. Dunn, NuWay failed to hire a replacement credentialing coordinator.

81.     In October 2018, NuWay conducted an internal audit and determined that it was not credentialing its clinicians. Having fired its credentialing coordinator in 2016, NuWay no longer submitted credentialing applications or coordinated the credentialing process for its clinicians. Because failing to credential treating clinicians violated Medical Assistance and MCO billing policies and provider manuals, it was recommended that NuWay immediately begin credentialing clinicians.

82.     In October 2019, NuWay leadership were again notified that it was failing to credential treating clinicians. Because failing to credential clinicians violated Medical Assistance and MCO billing policies and provider manuals, it was recommended that NuWay immediately begin credentialing clinicians.

83.     In December 2019, NuWay reinstated its credentialing process and began credentialing its treating clinicians.

84.     From December 2016 through December 2019, NuWay failed to credential all clinicians providing services at its clinics. During this period, all services provided by NuWay to Medicaid beneficiaries were undertaken by non-credentialed clinicians and all claims for reimbursement submitted to MHCPs were provided by non-credentialed clinicians.

85.     From December 2016 through December 2019, NuWay was reimbursed more than $14,635,000 for claims submitted to MHCPs for services provided by non-credentialed clinicians.

86.     These claims were false and fraudulent, and the false statements, implied certifications, and express certifications were material to MHCP's decision to pay the claims.

## KICKBACKS TO CLIENTS TO WHOM NUWAY PROVIDES COUNSELING SERVICES

87.     NUWAY advertises its Outpatient Facilities as giving clients the "option to live in independently run recovery residences, located in the community of their choice, and have their housing fees subsidized while they attend treatment." NUWAY also states in advertisements that clients can remain in sober living regardless of receiving services at the Outpatient Facilities.

88.     The subsidy payments provided to clients of the Outpatient Facilities are provided by Foundation, but the subsidy is provided only if the individuals become clients of the Outpatient Facilities. By providing subsidies to prospective clients,

NUWAY provides something of value to the clients in exchange for allowing NUWAY to submit Medical Assistance or MCOs for counseling services.

89.     NUWAY provides other things of value to clients of the Outpatient Facilities in order to induce counseling services, including free drug testing, transportation services, and "nutritionally-based snacks" on any day during which the client attends counseling services.

90.     NUWAY knows, but does not care, that it is violating federal law by providing kickbacks to Medical Assistance clients. According to Marston, Vennes stated on August 12, 2022 that regulating agencies would overlook such infractions because of the good they were doing, and that "if they want to shut us down for providing bologna sandwiches, housing, and treatment to addicts, let them."

## SUBMISSION OF CLAIMS FOR COCHRAN CLIENTS WITHOUT ASSIGNMENT OF BENEFITS FORMS

91.     In September 2021, the Relator discovered that Cochran had changed its client admission process by adopting electronic forms, but did not create, or have clients complete, any "Assignment of Benefit" forms. The completion of these forms was required in order for Cochran to submit claims to MHCP payors. The Relator contacted Marston and the Quality, Training and Compliance Department at House for guidance, who turned to an outside vendor for assistance. Marston directed that the vendor's scope be kept narrow.

92.     On November 11, 2021, the Relator emailed Marston about corrective action for the claims that had been submitted to MHCP payors for Cochran clients in

30

the July-September 2021 time period for whom NUWAY did not have Assignment of Benefit forms (the "AOB Claims"). Marston asked the Relator to hold off on voiding claims on this basis, and set up a meeting for November 17, 2021.

93.     On November 15, 2021, the Relator met with Marston, discussing the AOB Claims. Marston stated that he could make an argument for not voiding the AOB Claims, and the Relator told Marston she believed failing to void the claims would be fraud. Marston told the Relator to "hold tight," and stated he would take the Relator's concerns to NUWAY's "legal" department, clarifying that he meant Meier, the Chief Administrative Officer who was not an attorney.

94.     On November 17, 2021, before the scheduled meeting, Marston emailed the Relator to report that he had conferred with Vennes on the issue of voiding the AOB Claims, but that the Relator should "stay with our plans." At the meeting, however, the outside vendor hired by NUWAY stated definitively that the claims should be voided and payments returned. Marston was present at the meeting.

95.     After the meeting was completed, the Relator emailed Marston for clarification as to whether "stay with our plans" meant to void the claims or refrain from voiding claims. Marston responded to the Relator that she should "hold tight" until he had again conferred with Vennes.

96.     On December 1, 2021, having heard no response on the AOB Claims, the Relator directed Revenue Cycle to begin voiding them, and reported the errors to MN DHS's Office of the Inspector General.

97.    On January 14, 2022, the voiding of the AOB Claims was still ongoing, and the Relator contacted Marston to update him on the status of voiding claims.  Marston again told the Relator to hold off on voiding claims, this time so that he could follow up with "legal."  As of the present date, the voiding of the remaining AOB Claims was still on hold.

98.    The AOB Claims were false and fraudulent, and the false statements, implied certifications, and express certifications were material to MHCP's decision to pay the claims.  Moreover, once the payments on the claims were identified by NUWAY, they did not return the claims within 60 days in violation of the False Claims Act.  42 U.S.C. § 1320a-7k(d)(3).

**BILLING FOR DIAGNOSTIC ASSESSMENTS WITHOUT ENROLLING AS A MENTAL HEALTH PROVIDER OR BILLING THE CLAIMS AS PROFESSIONAL CLAIMS**

99.    NUWAY advertises its services in the community as "serving individuals recovering from co-occurring substance use and mental health disorders.  As a provider of Substance Use Disorder Services, NUWAY was permitted to provide clients with services relating to co-occurring mental health conditions, for which NUWAY received increased reimbursements from MHCP through "HH" code modifiers.  The vast majority of NUWAY counseling claims were submitted with HH code modifiers.

100.    Despite the ability to provide some services for and receive reimbursement for mental health conditions that were co-occurring with substance use counseling, NUWAY was not enrolled with MN DHS as a mental health provider, and was not permitted to provide or submit claims for standalone mental health services.

101.    The Relator discovered that at some point before November 2021, NUWAY had been providing standalone mental health services in the form of Diagnostic Assessments ("DAs"). In a meeting on November 11, 2021, the Relator alerted Marston, Roberts, and Hansen that NUWAY was not permitted to bill for DAs, and that the Relator was holding all claims for reimbursement for DAs. Roberts stated that DAs were part of the "1115/ASAM 2.1 rollout" and maintained that they were billable for NUWAY as a 256G provider billing co-occurring services. The Relator clarified that NUWAY would need to be enrolled as a mental health provider to bill for DAs, and offered to help with enrollment procedures.

102.    Soon after the November 11, 2021 meeting, on November 15, 2021, the Relator's Revenue Cycle Department completed an audit that identified that DAs were being coded as individual sessions (H2035) by House Clinicians. The audit sampled the records of 280 clients, and had found that in 15% of those clients' records, there was evidence that DAs had been administered and coded as H2035 sessions.

103.    In a meeting on November 15, 2021, the Relator reported these results to Marston, who stated that he could make an argument on why the DAs claims should not be voided. Marston indicated that he would confer with CAO Meier about the issue.

104.    On November 16, 2021, the Relator informed Marston that as of that date, the Revenue Cycle Department would be auditing all individual session (H2035) claims to ensure that they were not really DAs, and that if there were evidence that the individual session were actually a DA, the Revenue Cycle Department would be

holding claims for reimbursement for those services. The Relator urged Marston to involve Roberts in the issue right away.

105.   Also on November 16, 2021, the Relator conferred with Hansen about the coding misalignment, and Hansen confirmed that House Clinicians had been instructed to record DAs as individual sessions (H2035). The Relator told Hansen that this practice was not compliant with billing requirements. The Relator told Hansen and Marston that claims for payment would not be submitted for sessions that were really DAs, and that billing for past DAs should be identified and voided, and payment returned to payors. Marston told the Relator the next day that he had conferred with Vennes on the issue, but told the Relator to "stay with our plans." In a meeting that day with an outside vendor, the vendor confirmed that the claims for DAs should be voided and/or refunded.

106.   From November 16, 2021 to the present, no claims for DAs have been submitted by or on behalf of NUWAY, but payments for claims for DAs from before that date have not been returned to payors.

### FIRST CAUSE OF ACTION

### VIOLATION OF 31 U.S.C. § 3729(a)(1)(A) FOR SUBMISSION OF FALSE CLAIMS THROUGH FALSE CODING

107.   The Relator repeats and realleges the preceding paragraphs as though fully set forth herein.

108.   As set forth above, Defendants have engaged in a systematic and deliberate course of conduct involving billing for group therapy sessions in 31-minute

increments, frequently in close succession, leading to billing of four or five hours of services for group sessions that were actually completed in two or three billable hours. Defendants submitted or caused claims to be submitted for such services, knowing that by doing so, they were submitting claims for services not actually provided.

109.    As a result of Defendants' billing fraud, the United States has suffered damages because MHCP programs paid for services not actually provided.

## SECOND CAUSE OF ACTION

### VIOLATION OF 31 U.S.C. § 3729(a)(1)(A) and (B) FOR SUBMISSION OF FALSE CLAIMS FOR UNCREDENTIALED CLINICIANS

110.    The Relator repeats and realleges the preceding paragraphs as though fully set forth herein.

111.    As described above, Defendants knowingly, or in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, presented or caused to be presented, false or fraudulent claims for payment by non-credentialed clinicians to Medicaid in violation of, *inter alia*, 31 U.S.C. § 3729(a)(1)(A).

112.    As described above, Defendants knowingly, or in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, made, used, caused to be made, or caused to be used, false records and statements that were material to the Medicaid's payment of Defendants' false and fraudulent claims, in violation of, *inter alia*, 31 U.S.C. § 3729(a)(1)(B).

113.    Each impermissible claim for the payment of the non-credentialed clinicians' services represents a false or fraudulent record or statement. Further, each

35

such claims submitted to Medical Assistance or MCOs constitutes a false or fraudulent claim for payment

114.    Unaware of the falsity of the claims and/or statements, and in reliance on the accuracy thereof, MHCPs paid for services provided by non-credentialed clinicians to Medicaid beneficiaries, causing harm to the United States.

### THIRD CAUSE OF ACTION

### VIOLATION OF 31 U.S.C. § 3729(a)(1)(A) FOR SUBMISSION OF FALSE CLAIMS RESULTING FROM VIOLATIONS OF THE ANTI-KICKBACK STATUTE

115.    The Relator repeats and realleges the preceding paragraphs as though fully set forth herein.

116.    Defendants provided kickbacks to the clients of Outpatient Facilities to induce them to submit to counseling services for which House would submit claims for reimbursement.

117.    The kickbacks described above resulted in the presentation of claims to MHCP payors.  Those claims were false claims because all Medicaid officials are prohibited from paying any claims that were induced through the payment of a kickback.

118.    The United States has suffered harm from Defendants' conduct because, unaware that claims for counseling services at the Outpatient Facilities were ineligible for reimbursement because of kickbacks, the Medical Assistance program and other MHCP payors reimbursed for those claims.

## FOURTH CAUSE OF ACTION

## VIOLATION OF 31 U.S.C. § 3729(a)(1)(C) FOR CONSPIRACY TO VIOLATE THE FALSE CLAIMS ACT

119.    The Relator repeats and realleges the preceding paragraphs as though fully set forth herein.

120.    Defendants Vennes, Marston, and Roberts have conspired to violate the False Claims Act, specifically 31 U.S.C. § 3729(a)(1)(G), for causing Defendants to retain overpayments that had been identified, in the form of AOB Claims, claims for Diagnostic Assessments, and reimbursements for claims that were made known to Vennes, Marston and Roberts to be false through internal or external audits.

121.    As a result of the conspiracy of Vennes, Marston and Roberts to retain overpayments, the United States has been harmed because Defendants have retained overpayments that should have been returned to Medical Assistance or other MHCP payors.

## FIFTH CAUSE OF ACTION

## VIOLATION OF 31 U.S.C. § 3729(a)(1)(G) FOR KNOWINGLY AVOIDING AN OBLIGATION TO RETURN OVERPAYMENTS

122.    The Relator repeats and realleges the preceding paragraphs as though fully set forth herein.

123.    Defendants have knowingly avoided the obligation to return overpayments to Medical Assistance and other MHCP payors for more than 60 days since they were identified.

37

124.    The AOB Claims submitted by Cochran in July, August and September of 2021 were only partially voided and repaid by Defendants, despite their identification more than 60 days ago.

125.    Claims for Diagnostic Assessments that were recorded as individual counseling sessions with the billing code H2035 before the date of November 16, 2021 were never voided, and the payments from those claims never returned, despite their identification more than 60 days ago.

126.    The payments from a wide variety of other claims submitted by Defendants were never returned, despite their identification of overpayments through internal Revenue Cycle Department audits, including in November 2021, through Alliant and Blue Cross Blue Shield audit findings in January 2022, through HMA findings presented in August 2022, and through the August 2022 preparation of spreadsheets detailing overlapping claims for reimbursement.

127.    As a result of Defendants' conduct, the United States has been harmed in an amount to be determined at trial.

## SIXTH CAUSE OF ACTION

### VIOLATIONS OF THE MINNESOTA FALSE CLAIMS ACT, M.S.A. §15C.01 *et seq.*

128.    Relator repeats and realleges the allegations set forth in the preceding paragraphs as if fully set forth herein.

129.    By virtue of the acts described above, including the conduct described in the First, Second, and Third Causes of Action, Defendants knowingly presented or

caused to be presented to an officer or employee of a Minnesota agency a false claim for payment or approval, in violation of M.S.A. §15C.02(a)(1).

130.   By virtue of the acts described above, including the conduct described in the Second Cause of Action above, Defendants knowingly made, used, or caused to be made or used a false record or statement to get a false or fraudulent claim paid or approved by a Minnesota agency, in violation of M.S.A. §15C.02(a)(2).

131.   By virtue of the acts described above, including the conduct described in the Fourth Cause of Action above, Defendants Vennes, Marston, and Roberts knowingly conspired to commit violations of M.S.A. §15C.02(a)(7), in violation of M.S.A. §15C.02(a)(3).

132.   By virtue of the acts described above, including the conduct described in the Fifth Cause of Action above, Defendants knowingly avoided an obligation to pay or transmit money or property to the State of Minnesota or MHCP payors, in violation of M.S.A. §15C.02(a)(7).

133.   Minnesota, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for the acts and/or conduct of Defendants as alleged herein.

134.   By reason of the Defendants' acts, the State of Minnesota has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

135. Pursuant to M.S.A. §15C.02(a), the State of Minnesota is entitled to three times actual damages plus the maximum penalty of $25,407 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

**WHEREFORE**, the Relator, on behalf of the United States, hereby prays that after a trial, this Court:

1. Enter judgment holding Defendants liable for a civil penalty of $25,407 for each violation of the False Claims Act and each violation of the Minnesota False Claims Act committed by Defendants;

2. Enter a judgment against Defendants for three times the amount of damages sustained by the United States and the State of Minnesota because of the acts of Defendants;

3. Award the Relator a percentage of the proceeds of the action in accordance with 31 U.S.C. § 3730(d) and M.S.A. §15C.13;

4. Award the Relator her costs and reasonable attorneys' fees for prosecuting this action; and

5. Enter such other relief which this Court finds just and equitable.

Respectfully submitted by:

**RELATOR MORGAN KLUENDER,**
By her attorneys,

Dated: October 18, 2022

/s/ Zoran Tasic
Zoran Tasic
MND Bar Number 6314122IL
Wexler Boley & Elgersma LLP
311 S. Wacker Drive, Suite 5450
Chicago, IL 60606
Email: zt@wbe-llp.com
(312) 837-1155 (Telephone)

/s/ Thomas M. Greene
Thomas M. Greene
210020(MA)*
tgreene@greenellp.com
Ryan P. Morrison
680238(MA)*
rmorrison@greenellp.com
**GREENELLP**
One Liberty Square, Suite 1200
Boston, MA 02109
(617) 261-0040 (Telephone)
(617) 507-6559 (Facsimile)
*pro hac vice motions to be filed*